Maureen BACKE, individually and on behalf of all others similarly situated, Plaintiffs,

v.

NOVATEL WIRELESS, INC.; Peter V. Leparulo; George B. Weinert; Robert M. Hadley; Slim S. Souissi; and Catherine F. Ratcliffe, Defendants.

Case No. 08–CV–01689–H (RBB).

United States District Court, S.D. California.

July 28, 2009.

Douglas R. Britton, Matthew P. Montgomery, Coughlin Stoia Geller Rudman and Robbins LLP, San Diego, CA, Lionel Z. Glancy, Glancy Binkow and Goldberg, Los Angeles, CA, Michael I. Fistel, Jr., Marshall P. Dees, Holzer Holzer & Fistel, LLC, Atlanta, GA, for Plaintiffs.

Eric Landau, Travis S. Biffar, Jones Day, Irvine, CA, for Defendants.

## ORDER DENYING RENEWED MOTION TO DISMISS CONSOLIDATED COMPLAINT

MARILYN L. HUFF, District Judge.

On January 9, 2009, lead Plaintiff Pension Fund Group filed a consolidated securities class action complaint ("Compl.") against Defendants Novatel Wireless, Inc. ("Novatel"), Peter V. Leparulo, George B. Weinert, Robert M. Hadley, Slim S. Souissi, and Catherine F. Ratcliffe (collectively, "Defendants"). (Doc. No. 23.) Before the Court is Defendants' renewed motion to dismiss the consolidated class action complaint. The Court denied Defendants' first motion to dismiss Plaintiff's consolidated complaint. (Doc. No. 45.) Defendants filed a motion for reconsideration of the Court's Order. (Doc. No. 53.) The Court granted Defendants' motion in light of the recent Supreme Court decision in *Ashcroft v. Iqbal,* —— U.S. ——, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), vacated its previous Order, and allowed Defendants to file a renewed motion to dismiss the consolidated complaint. (Doc. No. 70.) Defendants filed their renewed motion to dismiss and a request for judicial notice on June 26, 2009. (Doc. Nos. 77–80.) Plaintiff filed a response in opposition and a request for judicial notice on July 10, 2009. (Doc. Nos. 82–84.) Defendants filed a reply, a response to Plaintiff's request for judicial notice, and a request for judicial notice on July 20, 2009. (Doc. Nos. 88–90.) The Court held a hearing on the matter on July 24, 2009. Douglas Britton, Marshall Dees, Eric Niehaus, and Lucas Olts appeared on behalf of Lead Plaintiff. Eric Landau, Travis Biffar, and Shawn Harpen appeared on behalf of Novatel and the individual Defendants.

After careful consideration of the parties' papers and oral arguments, the Court denies Defendants' renewed motion to dismiss.

### Background

**A. Parties**

Plaintiff Pension Fund Group is the lead plaintiff in a securities class action against Defendants Novatel, Peter V. Leparulo, George B. Weinert, Robert M. Hadley,

Slim S. Souissi, and Catherine F. Ratcliffe. (Compl. ¶¶ 43–48.) Plaintiff alleges that during the Class Period, Novatel employed 300 people company-wide, with only 44 employees, including all five named individual Defendants, in "operations." (*Id.* ¶ 34.) Plaintiff alleges that Defendants essentially controlled Novatel, including its accounting practices, earning announcements, and SEC filings. (*Id.* ¶ 34.)

### 1. Plaintiff Pension Fund Group

Lead Plaintiff Pension Fund Group is comprised of Plumbers & Pipefitters' Local # 562 Pension Fund and Western Pennsylvania Electrical Employees Pension Fund. Plaintiff purchased securities during the Class Period and was allegedly damaged from its purchase. (Compl. ¶ 42.)

### 2. Defendant Novatel

Novatel is a provider of wireless broadband access solutions for the worldwide mobile communications market. (Compl. ¶ 43.) Novatel is headquartered in San Die go, California and trades stock under the symbol NVTL on the Nasdaq. (*Id.*)

### 3. Defendant Peter V. Leparulo

Leparulo was, at relevant times, Chairman and Chief Executive Officer ("CEO") of Novatel. (Compl. ¶ 44.) During the Class Period, Leparulo prepared and signed Novatel's Form 10–K, attesting that he had reviewed the contents of the filings to confirm that they did not contain untrue statements of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances, not misleading. (*Id.*) Leparulo issued statements in press releases and led the Company's conference calls with analysts and investors, representing himself as the primary person with knowledge about Novatel's business, outlook, financial reports, and business practices. (*Id.*) Plaintiff alleges that while in posses-

sion of non-public material information, Leparulo sold 473,357 shares of his Novatel stock for insider trading proceeds of $11,530,258 during the Class Period. (*Id.*)

### 4. Defendant George Brad Weinert

Weinert was, at relevant times, President of Novatel. (Compl. ¶ 45.) During the Class Period, Weinert prepared and signed the Company's Form 10–K and 10Q, and Sarbanes–Oxley Act of 2002 ("SOX") certifications filed with the SEC, attesting that he had reviewed the contents of the filings to confirm that they did not contain untrue statements of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances, not misleading. (*Id.*) Weinert also issued statements in press releases and led the Company's conference calls with analysts and investors, representing himself as the primary person with knowledge about Novatel's business, outlook, financial reports, and business practices. (*Id.*) Plaintiff alleges that while in possession of non-public material information, Weinert sold 121,985 shares of his Novatel stock for insider trading proceeds of $3,305,560 during the Class Period. (*Id.*)

### 5. Defendant Robert M. Hadley

Hadley was, at all relevant times, Senior Vice President of Worldwide Sales and Marketing of Novatel. (Compl. ¶ 46.) Plaintiff alleges that while in possession of non-public material information, Hadley sold 247,198 shares of his Novatel stock for insider trading proceeds of $4,681,696 during the Class Period. (*Id.*)

### 6. Defendant Slim S. Souissi

Souissi was, at all relevant times, Senior Vice President and Chief Technology Officer of Novatel. (Compl. ¶ 47.) Plaintiff alleges that while in possession of non-

public material information, Souissi sold 272,560 shares of his Novatel stock for insider trading proceeds of $5,488,870 during the Class Period. (*Id.*)

### 7. Defendant Catherine F. Ratcliffe

Ratcliffe was, at all relevant times, Senior Vice President of Business Affairs and General Counsel of Novatel. (Compl. ¶ 48.) Plaintiff alleges that while in possession of nonpublic material information, Ratcliffe sold 143,366 shares of her Novatel stock for insider trading proceeds of $3,646,804 during the Class Period. (*Id.*)

### B. Defendants' Alleged Fraudulent Scheme and False Statements

Plaintiff alleges that between February 27, 2007 and November 10, 2008 (the "Class Period"), Defendants engaged in a fraudulent scheme to inflate Novatel's stock value so that Defendants could sell their stock in the company for a profit. (*Id.* ¶¶ 1, 12.) Plaintiff alleges that Novatel's success was largely dependent on its ability to supply wireless modems to its two largest customers, Sprint and Verizon, which in 2006 accounted for 38.2% and 19.7% of Novatel's revenue respectively. (*Id.* ¶ 14.) According to Plaintiff, "defendants knew that the market was particularly sensitive to information about these customers" and "[s]trong financial results would surely spur an increase in Novatel's stock price whereas any negative information regarding these customers would reduce it." (*Id.* ¶ 14.) Plaintiff alleges that throughout the class period, Defendants made false and misleading statements concerning Novatel's market share and financial results, failed to disclose material information about its contracts with Sprint, and failed to disclose that Novatel was prematurely shipping products in order to meet or exceed Wall Street expectations causing Novatel to improperly recognize revenue. Plaintiff alleges that during the Class period, Defendants were unloading

their stock based on this inside information and benefitting from the artificially inflated stock price.

### 1. Sprint Cancellation

In early 2007, Novatel reported strong financial results. It told investors that its USB modem was extremely successful in the market, and that Novatel was seeing strong sales to Verizon and Sprint. (*Id.* ¶ 15.) On February 27, 2007, Defendant Weinert, in a press release, stated with respect to the first quarter of 2007, that "[Novatel] continue to ramp to meet increasing demand in the marketplace." (*Id.* ¶ 51.) Weinert also stated that day during the Company's earnings conference call, that competitors are using "fairly well tried out, older technologies and really the market isn't ready for that right now." (*Id.* ¶ 52.) In a press release on May 1, 2007, Novatel reported first quarter revenue increases of 174% year over year and Weinert stated that "[o]ur first quarter performance was the best in Company history ... Sales were even higher than forecasted in our revised guidance due to strong end-of-the-quarter momentum for newly introduced ExpressCards and Ovation USB devices." (*Id.* ¶¶ 53–54.) On May 1, 2007, during the Company's earnings conference call, Defendant Leparulo stated that "the market for 3G Wireless is taking off and we believe we're perfectly positioned to take advantage of that growth." (*Id.* ¶ 55.) Defendant Weinert stated that, "[w]e certainly see strong demand for [our first generation] products, and we're leading the way, we're actually in a leadership position, in both the express card and the USB markets." (*Id.* ¶ 55.) On May 10, 2007, Novatel filed its Quarterly Report on Form 10–Q containing Sarbanes–Oxley Act of 2002 ("SOX") certifications with the SEC, which was signed by Defendant Weinert and which reaffirmed Novatel's financial results pre-

viously announced on May 1, 2007. (*Id.* 56.)

Plaintiff alleges that these statements about the Company's financial results and market share were false and misleading because they did not fairly present the financial condition of the Company throughout the first quarter of 2007. (*Id.* ¶ 57.) Plaintiff alleges that Novatel failed to disclose it was prematurely shipping product to meet or exceed its quarterly and year-end forecasts, failed to disclose that Sprint would discontinue all further orders of the Company's popular 720 USB card by the end of July 2007, concealed that the Company's product mix failed to meet the immediate needs of its two largest domestic customers, Sprint and Verizon, which was causing Novatel to lose market share, and signed false SOX certifications attesting to the accuracy of the financial results and effectiveness of Novatel's internal controls, as the Company admitted on November 10, 2008 that there were several control deficiencies in the Company's internal control over financial reporting that in the aggregate constituted a material weakness. (*Id.* ¶ 57.)

Plaintiff alleges that at the same time, Defendants were selling significant amounts of their Novatel holdings. Plaintiff alleges that during the Class Period, Defendants sold 1,258,466 shares of Novatel stock for almost $29 million in proceeds. (*Id.* ¶ 15.) Plaintiff alleges that 62% of the Defendants' Class Period sales occurred in June and July 2007, just before the market learned that Sprint would no longer be purchasing Novatel's 720 USB modem, information the company allegedly knew "for some time." (*Id.* ¶ 16.) Defendants sold this stock at the same time that Novatel was certified by Vodafone to sell its products in late June 2007, and when Novatel was on the verge of being certified at Telefonica and T–Mobile. (*Id.* ¶ 18.) Novatel's stock price fell from $29 in late July to almost $20 by the beginning of August. (*Id.* ¶ 17.) According to an analyst on July 20, 2007, "NVTL shares were off sharply this morning, we believe in response to a rumor that NVTL may lose market share at Sprint ... We agree with the notion making the rounds indicating that the popular EU 720 USB card from NVTL will in fact be end-of-lifed at Sprint as early as next week."[1] (*Id.* ¶ 17.)

## 2. Loss of Market Share

Plaintiff alleges that Novatel not only lost market share with Sprint's cancellation of the 720 USB modem, but throughout 2007 and continued to mislead investors. (Compl. ¶ 20.) On June 8, 2007, Defendant Weinert in a press release stated, "[w]e are currently seeing strong demand across our major product lines, most notably for our ExpressCards and Ovation USB devices." (*Id.* ¶ 58.) Novatel reported 113% revenue growth in 2Q07 and 90% revenue growth in 3Q07, which Defendants emphasized exceeded previous guidance. (*Id.* ¶¶ 59, 63.) In a press release dated August 6, 2007, Weinert stated that, "[d]emand is strong across a wide range of

---

**1.** The Complaint only partially quotes the analyst report. The quote goes on to state: however our sources have indicated that Sprint has ample inventory and that the cards will continue to be sold at Sprint stores likely through the end of August. We further believe that NVTL will begin shipping the new smaller form factor USB product in August (earlier than expected) and that the cards will likely begin showing up on Sprint shelves in early September, immediately after the EU720 inventory sells out. We understand this transition has been jointly planned for some time by NVTL and Sprint. As a result, we think there will be little or no gap in the sales of the two cards and as a result, no loss of market share.

(Doc. No. 79, Ex. A.)

products" and that "[a]doption of USB wireless modems has been a primary growth driver with over $85 million in sales in the nine months since its introduction." (*Id.* ¶ 59.) On November 5, 2007, on the Company's earnings conference call, Defendant Leparulo stated, "[we] saw strong demand for these products, and beat guidance and expectations once again. Our market continues to grow rapidly as 3G wireless data proliferates into mainstream technology." (*Id.* ¶ 64.) On the same call, Weinert stated that demand for Novatel's Next Generation USB products was so strong that, "our major hurdle is tightness in our supply channel for selected components due to the strong demand." (*Id.* ¶ 64.) Weinert stated on August 6, 2007, on the Company's earnings conference call that, "[w]e had an exceptionally strong first half of the year with Sprint." (*Id.* ¶ 60.)

Plaintiff alleges that these statements and the Company's 10–Q filings were false and misleading because Novatel was losing market share to competitors. Other wireless carriers were targeting the consumer market by slashing monthly service fees. (*Id.* ¶ 23.) Novatel did not have a viable USB product to immediately compete in this retail market and lost market share to its competitors not only at Sprint, but also at Verizon and in Europe at T–Mobile, Telefonica/O2, and Orange. (*Id.* ¶ 24.) Plaintiff also alleges that Novatel shifted its focus to the European market in the second half of 2007 because Defendants knew that Novatel was losing market share in the United States. (*Id.* ¶¶ 25–27.) Novatel's international sales trended upward throughout 2007, even though international sales adversely affected Novatel's profit margins. (*Id.* ¶¶ 25–27.)

Plaintiff alleges that Novatel's statements concerning the demand for its products were also false and misleading because Defendants failed to disclose that Novatel was prematurely shipping products. (*Id.* ¶ 28.) Plaintiff alleges that in early 2007, Novatel began shipping as much product as it could to its customers to meet its quarterly and year-end forecasts. (*Id.* ¶ 28.) A former Novatel employee explained, there was always a crunch time at the end of each quarter and that Novatel would frequently ship large amounts of product up to four weeks early so it allegedly could recognize the revenue up front in the current quarter and meet or exceed Wall Street expectations. (*Id.* ¶ 28.) Novatel sold product on credit with extended payment terms in 2007 to Sprint and Verizon in order to ship product early and increase its financial results. (*Id.* ¶ 30.) This practice caused Verizon and Sprint to be flush with inventory by 4Q07. (*Id.* ¶ 31.) Novatel admitted on November 10, 2008, in its delayed Form 10–Qs for the first and second quarters of 2008, that there were several control deficiencies in the Company's internal control over financial reporting that in the aggregate constituted a material weakness. (*Id.* ¶¶ 28, 62.) Plaintiff alleges that Novatel's stated financial results misled analysts about end-market demand and sales execution because of this practice of early shipment to post strong results throughout 2007. (*Id.* ¶ 29.)

### 3. Prematurely Recognized Revenue in Violation of Novatel's Revenue Cut–Off Procedures and Generally Accepted Accounting Principles ("GAAP")

Plaintiff alleges that Defendants' scheme to inflate revenues began to unravel in the first quarter of 2008. (Compl. ¶ 32.) On February 20, 2008, Novatel issued a press release forecasting $110 million in revenues for 1Q08, which was $10 million below analysts' estimates. (*Id.* ¶¶ 67–68.) Novatel attributed this guidance to a consolidation issue at its customers who were sup-

posedly focusing on eliminating inventory from Novatel's competitors, stating that, "[w]e believe that the major North American carriers are looking to significantly consolidate vendors down to two suppliers ... this may have some modest impact as carriers flush through competitors' products as they consolidate vendors and lower inventory." (*Id.* ¶ 68.) Defendants also disclosed on February 20, 2008 that Novatel was seeing the market shift to the consumer segment, and that this "is a positive move that increases our addressable market." (*Id.* ¶ 70.) Defendants' forecasts for 1Q08 and their explanations for them took analysts by surprise as none of Novatel's competitors had mentioned the consolidation issue at Sprint and Verizon when raising their outlooks for the quarter. (*Id.* ¶¶ 67–70.) Plaintiff alleges that in reality, Novatel's main customers were over extended because of early shipments and had to clear their inventory. (*Id.* ¶ 32.) Novatel's stock price dropped from approximately $14 to as low as $10.20, or roughly 27%, after Defendants' disclosures. (*Id.* ¶ 33.) On March 3, 2008, Novatel filed its Annual Report on Form 10–K with the SEC largely reaffirming the financial results for 4Q07 and fiscal year 2007 announced on February 20, which was signed by Defendants Weinert and Leparulo and contained SOX certifications. (*Id.* ¶ 72.)

Through 1Q08, Defendants repeated the Company's guidance and told analysts that "we are very pleased with the long-term trends and how we are positioned to fulfill them." (*Id.* ¶¶ 33, 74.) On April 14, 2008, Novatel disclosed preliminary results for 1Q08 that were $19 million below the Company's original forecast of $110 million, and $29 million below the original analyst estimates of $120 million. (*Id.* ¶ 76.) Defendant Leparulo partially attributed this shortfall to the fact that Novatel was "between product launch cycles for our USB devices and demand in the current envi-

ronment has shifted toward lower end products" and that, "in some cases, we did not have the right products for the right customers." (*Id.* ¶¶ 76, 77.) On May 1, 2008, Novatel issued a press release which stated that, "revenues for the first quarter of 2008 were $91.3 million." (*Id.* ¶ 78.) On May 13, 2008, Novatel filed a Form 12b–25 with the SEC for an extension of time to file its Form 10–Q, disclosing that Novatel could not file its Form 10–Q for the quarter because the Company and its Audit Committee undertook an enhanced review of the accounting for a specific customer contract, stating that the review was substantially completed. (*Id.* ¶ 79.) Novatel claimed that the review was not expected to change any previously reported financial statements or earnings. (*Id.* ¶ 79.)

Plaintiff alleges that Novatel's financial results concerning 1Q08 revenues and earnings, as reported in press releases, SEC filings, and conference calls were false and misleading. (*Id.* ¶ 80.) Plaintiff alleges that Novatel failed to disclose that the Company was recognizing revenue in violation of its own revenue cut-off procedures and GAAP, thus rendering the Company's publicly reported financial results materially false. (*Id.* ¶ 80.) On August 19, 2008, Novatel announced that it had broadened its accounting review and determined to move at least $3.4 million in revenue out of 1Q08. (*Id.* ¶ 81.) Plaintiff alleges that as a result of this disclosure, Novatel's stock price dropped from $8.40 to $6.29 in one day. (*Id.* ¶ 83.) On November 10, 2008, Novatel issued its delayed Form 10–Qs for the first and second quarters of 2008, disclosing that the revenues for the first quarter were misstated by $3.4 million due to improper revenue cut-off procedures and accounting irregularities relating to certain customer contracts. (*Id.* ¶ 84.) The Form 10–Qs also indicated that there were several control deficiencies in Novatel's internal control

over financial reporting that in the aggregate constituted a material weakness during the Class Period. (*Id.* ¶ 84.) After the November 10 disclosure, Novatel's stock slid below $5 per share, trading as low as $3.90 per share by November 17, 2008. (*Id.* ¶ 85.)

## Discussion

### I. Motion to Dismiss Pursuant to 12(b)(6)

A motion to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the claims asserted in the complaint. *Navarro v. Block,* 250 F.3d 729, 731 (9th Cir.2001). A complaint generally must satisfy only the minimal notice pleading requirements of Federal Rule of Civil Procedure 8(a)(2) to evade dismissal under a Rule 12(b)(6) motion. *Porter v. Jones,* 319 F.3d 483, 494 (9th Cir.2003). Rule 8(a)(2) requires that a pleading stating a claim for relief contain "a short and plain statement of the claim showing that the pleader is entitled to relief." The function of this pleading requirement is to "give the defendant fair notice of what the ... claim is and the grounds upon which it rests." *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1964–65, 167 L.Ed.2d 929 (2007).

The Supreme Court in *Ashcroft v. Iqbal,* — U.S. —, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), recently reiterated that to survive a motion to dismiss a complaint's request for relief must be " 'plausible on its face.' " *Id.* at 1949 (*quoting Twombly,* 550 U.S. at 570, 127 S.Ct. 1955). A claim is facially plausible when the alleged facts "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Determining the plausibility of a claim is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 1950. " '[N]aked assertion[s] devoid of further factual enhancement' " will not do. *Id.* at 1949 (*quoting Twombly,* 550 U.S. at 557, 127 S.Ct. 1955). While the court takes all factual allegations in the complaint as true, legal conclusions couched as factual allegations are not sufficient to survive a motion to dismiss. *Id.* at 1949. The Court in *Iqbal* used a two-pronged approach to determine if the pleadings were sufficient. *Id.* at 1950. First, the Court examined the pleadings to identify the allegations in the complaint that are not entitled to the assumption of truth. *Id.* Next, the Court considered the factual allegations in respondent's complaint to determine if they plausibly suggest an entitlement to relief. *Id.* at 1951.

"Generally, a district court may not consider any material beyond the pleadings in ruling on a Rule 12(b)(6) motion." *Hal Roach Studios, Inc. v. Richard Feiner & Co.,* 896 F.2d 1542, 1555 n. 19 (9th Cir. 1990). The court may, however, consider the contents of documents specifically referred to and incorporated into the complaint. *Branch v. Tunnell,* 14 F.3d 449, 454 (9th Cir.1994). In evaluating a motion to dismiss, a court may consider evidence on which the complaint "necessarily relies" as long as: (1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the copy attached to the 12(b)(6) motion. *Marder v. Lopez,* 450 F.3d 445, 448 (9th Cir.2006). Defendants request that the Court take judicial notice of forty-one documents, including certain analyst reports, press releases and

conference call transcripts incorporated into the Complaint by reference, various public filings made by Novatel with the Securities and Exchange Commission ("SEC") between 2006 and 2008, historical prices of Novatel stock and Sierra Wireless, Inc.'s stock, and certain accounting standards related to the audit procedures for internal control. (Doc. Nos. 78–79.) Plaintiff also requests the Court take judicial notice of various documents, including Novatel's June 21, 2007 Proxy Statement, filings with the SEC, historical stock prices, a conference call transcript, a summary of Defendants' stock sales, and an analyst report. (Doc. Nos. 83–84.) Additionally, Defendants in their reply request judicial notice of SOX certifications attached to Novatel's Form 10–K for the year 2007. (Doc. No. 90.) The Court grants the parties' request to the extent that the materials are properly subject to judicial notice.

**Falsity and Scienter**

Claims for violations of the federal securities laws are subject to additional pleading requirements imposed by the Private Securities Litigation Reform Act of 1995 ("PSLRA").[2] The PSLRA dictates that a securities complaint must "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u–4(b)(1). The Ninth Circuit traditionally analyzes the overlapping requirements of falsity and scienter at the same time. *Ronconi v. Larkin,* 253 F.3d 423, 429 (9th Cir.2001) (pleading requirements of PSLRA may be collapsed into single inquiry because analysis of both factors involves same facts); *see No. 84 Employer–Team-*ster Joint Council Pension Trust Fund v. America West Holding Corp.,* 320 F.3d 920, 932 (9th Cir.2003). A securities fraud claim must "state with particularity facts giving rise to a strong inference" that each defendant acted with the intent to defraud or with deliberate recklessness. 15 U.S.C. § 78u–4(b)(2); *America West,* 320 F.3d at 931; *In re Silicon Graphics Inc. Securities Litig.,* 183 F.3d 970, 979 (9th Cir.1999) ("deliberate or conscious recklessness").

As the Ninth Circuit has recognized, "an inevitable tension arises between the customary latitude granted [to] the plaintiff on a motion to dismiss under Fed.R.Civ.P. 12(b)(6), and the heightened pleading standard set forth under the PSLRA." *Gompper v. VISX, Inc.,* 298 F.3d 893, 895 (9th Cir.2002). The Court accepts as true the well-plead factual allegations of Plaintiff's Complaint; however, with respect to the element of scienter, "the court must consider all reasonable inferences to be drawn from the allegations, including inferences unfavorable to the plaintiffs." *Id.* at 897. The PSLRA requires a court to "review[ ] the complaint in its entirety to determine whether the totality of facts and inferences demonstrate a strong inference of scienter." *Id.* at 895.

**A. Violation of § 10(b) of the 1934 Act and Rule 10b–5 Against Defendants Leparulo and Weinert**

Plaintiff's first cause of action alleges Defendants Leparulo and Weinert violated § 10(b) of the 1934 Act and Rule 10b–5 by "disseminat[ing] or approv[ing] the false statements specified above, which they knew or recklessly disregarded were mis-

---

**2.** Rule 9(b) of the Federal Rules of Civil Procedure, which imposes a heightened pleading standard on claims sounding in fraud, also applies to some of Plaintiff's claims. *Yourish v. Cal. Amplifier,* 191 F.3d 983, 993 (9th Cir. 1999) (noting applicability of Rule 9(b) to securities fraud I claims); *see Desaigoudar v. Meyercord,* 223 F.3d 1020, 1023 (9th Cir. 2000) ("The PSLRA modifies Rule 9(b)"). The Court concludes that to the extent Plaintiff has satisfied the strictures of the PSLRA, the Complaint also is sufficient under Rule 9(b).

leading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." (Compl. ¶¶ 141–45.)

To state a claim under § 10(b) of the Securities and Exchange Act of 1934 ("Exchange Act"), a plaintiff must allege: " '(1) a material misrepresentation or omission of fact, (2) scienter, (3) a connection with the purchase or sale of a security, (4) transaction and loss causation, and (5) economic loss.' " *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir.2008). Defendants argue that Plaintiff's complaint fails to adequately plead material misrepresentations, a strong inference of scienter, and loss causation, and therefore fails to state a claim under § 10(b) and Rule 10b–5. (Doc. No. 80.)

## 1. False and Misleading Statements

The PSLRA requires a plaintiff to plead allegedly false or misleading statements by "specify[ing] each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." 15 U.S.C. § 78u–4(b)(1); *see Desaigoudar*, 223 F.3d at 1023. Plaintiff alleges that Defendants Weinert and Leparulo made false or misleading statements concerning financial results, demand for Novatel products, and the sufficiency of Novatel's internal controls contained in SOX certifications.

### a. Financial Results

Plaintiff alleges that Novatel's financial results as stated by Weinert and Leparulo were materially misleading throughout the Class Period and did not fairly present the financial condition of Novatel. (Compl. ¶¶ 57, 62, 66, 73, 80.) Plaintiff alleges that Novatel's financial results were rendered false and misleading by Novatel's admission that the Company's financial results in 1Q08 were false and overstated and by

Novatel's misrepresentation as to the effectiveness of Novatel's internal controls throughout the entire Class Period on its SOX certifications, which were signed by Defendant Weinert. (*Id.* ¶¶ 73, 80, 84.) Plaintiff further alleges that Novatel's admission that it recognized revenue in violation of the Company's own revenue cut-off procedure and GAAP corroborates the allegation that Novatel was shipping product early to meet Wall Street expectations as a regular quarterly practice throughout the Class Period, thereby rendering the financial results misleading. (*Id.* ¶¶ 80, 112.) Plaintiff also alleges that the financial results were false or misleading because Novatel concealed that the Company's product mix failed to adequately meet the immediate needs of its two largest domestic customers, Sprint and Verizon, which caused Novatel to lose market share. (*Id.* ¶¶ 57, 62, 66, 73.)

The Court concludes that with respect to financial results, Plaintiff has adequately alleged false and misleading statements and the reasons those statements were false and misleading. Plaintiff specifically alleges that Weinert and Leparulo were responsible for these statements, as they were quoted in press releases, conference calls, and signed SEC filings attesting to the accuracy of the financial results and effectiveness of the Company's internal controls. Plaintiff alleges that on April 14, 2008, Defendants announced preliminary revenue results for 1Q08 of $91 million, which was confirmed by Defendants on May 1, 2008 when Defendants announced Novatel's 1Q08 results of $91.3 million. (Compl. ¶¶ 76–78.) On May 13, 2008, the Company filed a Form 12b–25 with the SEC for an extension of time to file its Form 10–Q, but stated that an accounting review of a specific customer contract would not impact Novatel's financial results for the quarter. (*Id.* ¶ 79.) Plaintiff alleges that these statements were false

because on August 19, 2008, Novatel announced that it determined to move at least $3.4 million in revenue out of 1Q08 and used improper accounting practices. (*Id.* ¶¶ 81, 91, 92.) Plaintiff has alleged that Defendants overstated financial results and gives the reasons why the financial results were misleading. Accordingly, the Court concludes that Plaintiff has plead with sufficient particularity false or misleading financial statements.

### b. Product Demand and Market Share

Plaintiff also alleges that Defendants' statements concerning the demand for Novatel's products were false and misleading. Weinert and Leparulo made various statements in press releases and conference calls during the Class Period that there was strong demand for Novatel's products, including for its USB products. (Compl. ¶¶ 51, 52, 54, 55, 59, 60, 63, 64, 67.) Plaintiff alleges that these statements were false and misleading because during the Class Period Novatel was losing USB domestic market share to its competitors, as it did not have a modem to compete in the low-end market, Sprint cancelled its use of the 720 USB modem, Novatel could not compete for a contract with Sprint to provide WiMax data cards and USB modems, and Novatel shifted focus to the European market. (*Id.* ¶¶ 16–18, 20–27.)

The Court concludes that Plaintiff has adequately alleged false or misleading statements concerning the demand for Novatel's products and market share as Plaintiff alleges specific statements made by Defendants Weinert and Leparulo and the reasons these statements are allegedly false or misleading. Defendant Weinert's and Leparulo's statements are not too generalized or vague, as Defendants made statements such as that Novatel was experiencing "strong demand across our multipronged 3G product portfolio," was "continu[ing] to ramp to meet increasing de-

mand in the marketplace," saw strong demand "across a wide range of products including Ovation USB devices, Merlin PC and Express cards, and Expedite embedded modems," had "innovative products and strong partnerships," expected "strong results, driven by both continuing demand for existing products and the introduction of new products," expected "to be well positioned as WiMAX moves into volume demand," and had "transitioned to Next Generation USB products seeing a stronger uptick in both the U.S. and Europe" and "[d]ue to this demand, we enter the fourth quarter with strong backlog and record order flow ... our major hurdle is tightness in our supply channel for selected components due to the strong demand." (Compl. ¶¶ 51, 54, 59, 60, 64.) Plaintiff alleges that some of these statements were made by Defendants at the same time they failed to disclose that one of the Company's largest customers, Sprint, would discontinue all further orders of the Company's popular 720 USB card. (*Id.* ¶ 57.) Defendants refute Plaintiff's characterization of Sprint discontinuing orders for 720 USB cards, citing the full text of the analyst report on which the Complaint quotes. (Doc. No. 79 Ex. A.) Defendants argue that Sprint did not in fact cancel orders, but transitioned from the 720 USB modem to a new Novatel product line. Defendants have not asserted that Sprint did not stop ordering the 720 USB modem from Novatel, and the analyst report's speculation that Novatel would not lose shelf space or market share does not show that Plaintiff's allegations of a cancellation are inherently implausible or false. Defendants also disclosed in early 2008 that, "in some cases, we did not have the right products for the right customers." This statement undercuts Defendants' previously made statements about Novatel's ability to compete in the 3G market and the strong demand for its products. Plaintiff's

complaint pleads these allegedly false and misleading statements and the reasons why they are false and misleading with enough particularity to get to discovery.

### c. Internal Controls

Plaintiff also alleges that Defendants Weinert and Leparulo made false or misleading statements by falsely certifying in SOX certifications the Company's financial results and effectiveness of the Company's internal controls, as it was later disclosed that there were several control deficiencies in the Company's internal control over financial reporting that in the aggregate constituted a material weakness. (Compl. ¶¶ 56–57, 61–62, 65–66, 72–73.) Defendants contend that Defendants did not sign any false SOX certifications for the time period in which the internal control weaknesses were found and identified. (Doc. No. 89 at 3–4.) Plaintiff asserts that the internal control deficiencies identified in 2008 were ones of "design" as announced by Novatel in November 2008 and as such must have been present in 2007. Plaintiff's allegations of internal control deficiencies in 2007 are corroborated by a confidential witness's allegations that Novatel regularly engaged in early shipments in violation of GAAP in order to meet or exceed Wall Street expectations. (*Id.* ¶ 28.)

The Court concludes that Plaintiff does not sufficiently allege false SOX certifications signed by Defendant Weinert or Leparulo. The complaint alleges no SOX certifications signed by Leparulo. The Court concludes that Plaintiff fails to plead with particularity how the identified SOX certifications signed by Weinert were false or misleading concerning Novatel's internal controls and financial results. Plaintiff alleges that Novatel disclosed internal control deficiencies in November 2008 relating to the moved revenue from 1Q08 to 2Q08. However, Plaintiff does not allege that Novatel filed false SOX certifications attest-

ing to the accuracy of financial results or the effectiveness of the company's internal controls for any Form 10–Qs filed for 1Q08 or 2Q08. The SOX certifications alleged relate to other filings that were not restated by Novatel and for which no internal control deficiencies were announced by Novatel. Additionally, Plaintiff does not cite, nor has the Court located, any case holding that a statement in a SOX certification that financial statements comply with GAAP is independently actionable under § 10(b) or Rule 10b–5. However, Plaintiff sufficiently alleges other false or misleading statements to state a claim under § 10(b).

### 2. Safe Harbor Provision

Defendants argue that Plaintiff alleges false or misleading statements that were forward-looking and accompanied by meaningful cautionary statements, and therefore are nonactionable. (Doc. No. 80 at 24–25.) In order for a forward-looking statement to be actionable, a plaintiff must allege "facts that would create a strong inference that the defendants made the forecasts with 'actual knowledge ... that the statement[s were] false or misleading' at the time made." *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1091 (9th Cir. 2002) (*quoting* 15 U.S.C. § 78u–5(c)(1)(B)(I)).

The Court concludes that Plaintiff alleges statements other than forward-looking statements that were false and misleading, such as financial results and statements concerning present product demand. (*See, e.g.,* ¶¶ 51, 53, 54, 55, 58, 59.)

### 3. Materiality

■ Information is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of informa-

tion made available." *Basic Inc. v. Levinson,* 485 U.S. 224, 231–32, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) (*quoting TSC Indus. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)). "Determining materiality in securities fraud cases 'should ordinarily be left to the trier of fact.'" *S.E.C. v. Phan,* 500 F.3d 895, 908 (9th Cir.2007) (*quoting In re Apple Computer Secs. Litig.,* 886 F.2d 1109, 1113 (9th Cir.1989)). The Court determines that the Plaintiff has sufficiently alleged false and misleading statements that were material. The alleged manipulation of revenue results by improper accounting and early shipment of product caused Novatel to overstate the Company's financials, product demand, and market share. The significance of this information is illustrated by the emphasis Defendants placed on year over year growth, continuing strong product demand, strong partnerships in press releases and other public statements, and the market reaction to the alleged disclosures.

### 4. Scienter

To state a claim under § 10(b), a plaintiff must allege facts giving rise to a strong inference that the defendants acted knowingly or with deliberate recklessness. *See Nursing Home Pension Fund, Local 144 v. Oracle Corp.,* 380 F.3d 1226, 1230 (9th Cir.2004). The Supreme Court has held that a § 10(b) plaintiff "must plead facts rendering an inference of scienter at least as likely as any plausible opposing inference." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 127 S.Ct. 2499, 2513, 168 L.Ed.2d 179 (2007). "The inference that the defendant acted with scienter need not be irrefutable, i.e., of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Id.* at 2510 (internal quotations omitted). "[T]he court's job is not to scrutinize each allegation in isolation but to assess all the allega-

tions holistically." *Id.* at 2511 (citation omitted).

■ "To adequately demonstrate that the 'defendant acted with the required state of mind,' a complaint must 'allege that the defendants made false or misleading statements either intentionally or with deliberate recklessness.'" *Zucco Partners, LLC v. Digimarc Corp.,* 552 F.3d 981, 991 (9th Cir.2009) (citations omitted). Facts showing mere recklessness or motive to commit fraud and opportunity are not sufficient to establish a strong inference of deliberate indifference. *Id.* "[T]he plaintiff must plead 'a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.'" *Id.* (citations omitted).

■ Plaintiff's complaint alleges that Novatel's top management was fully aware of the allegedly undisclosed information during the Class Period because of the size of the company and statements made by Leparulo that he oversaw the day-to-day operations and that the buck stopped with him. (Compl. ¶¶ 3–4, 10, 16, 116.) Plaintiff alleges that Defendants were undoubtedly aware of Sprint's cancellation of orders for the 720 USB modem due to the size and importance of Sprint's business, as Sprint accounted for 38% of Novatel's revenue in 2006. (*Id.* ¶¶ 14, 121.) Plaintiff also alleges that Defendants were undoubtedly aware of the loss of its market share throughout 2007, given the competitive market and the Company's shift to the European market. (*Id.* ¶¶ 25–26, 122.) Plaintiff argues that there is a reasonable inference that Novatel would not have targeted a less profitable market if they were competitive in the most profitable one.

"As a general matter, 'corporate management's general awareness of the day-to-day workings of the company's business does not establish scienter-at least absent some additional allegation of specific information conveyed to management and related to the fraud' or other allegations supporting scienter." *South Ferry LP, No. 2 v. Killinger,* 542 F.3d 776, 785–86 (9th Cir.2008) (citation omitted).

■ To support Plaintiff's core management theory, the complaint alleges insider sales that were suspicious in timing and amount and unusual compared to prior trading history. (Compl. ¶¶ 116–20.) "[I]nsider trading is suspicious only when it is dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." *Ronconi,* 253 F.3d at 435 (internal quotations omitted). The three relevant factors are: "(1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history." *Id.* Plaintiff alleges that Defendants' stock sales were predominately made between May 2007 and November 2007, at prices near the Class Period high of $29 per share. (Compl. ¶ 117.) Plaintiff alleges that 62% of the Defendants' Class Period sales occurred in June and July 2007. (*Id.* ¶ 16.) Plaintiff alleges that Weinert and Leparulo adopted or amended their 10b5–1 trading plans to allow them to sell more shares of stock. (*Id.* ¶ 117.) During nine months of the Class Period, Plaintiff alleges that Defendants Hadley, Leparulo, Ratcliffe, Souissi, and Weinert all sold over 90% of their Novatel holdings (excluding vested options) for a combined total of almost $29 million and 1,258,466 shares. (*Id.* ¶ 118.) Plaintiff alleges this was unusual compared to prior trading history, as during the five years prior to the Class Period, Defendants Hadley, Leparulo, Ratcliffe, Souissi, and Weinert sold 938,316

shares of Novatel stock, for a total of almost $18.3 million in proceeds. (*Id.* ¶ 120.) Specifically, Leparulo made only one trade in 2005 and none in 2006. (*Id.* ¶ 119.) Plaintiff alleges that Weinert made no sales within the five years prior to the class period. (*Id.* ¶ 119.)

Defendants argue that their stock sales do not support a strong inference of scienter because they traded according to 10b5–1 plans and Plaintiff does not allege facts to establish that Defendants' trades were not dramatically out of line with prior trading practices. (Doc. No. 80 at 15–18.) Defendants contend that Leparulo's sales were consistent with his prior trading practices because he previously had sold shares when Novatel stock traded in the $20–25 range and Novatel had not traded in that range for several years. (*Id.* at 16, 18.) Plaintiff responds that the amount of stock that Leparulo sold during the class period is out of proportion with prior sales, most of his sales during the class period occurred just weeks before the market learned of the alleged Sprint cancellation, Leparulo had sold at prices below $20 per share, and Leparulo did not sell after the disclosure of the Sprint cancellation when prices again reached over $20 per share. (Compl. ¶¶ 116–119.) Sales made pursuant to 10b–5–1 plans can rebut an inference of scienter. *Metzler Inv. GMBH v. Corinthian Colleges, Inc.,* 540 F.3d 1049, 1067 n. 11 (9th Cir.2008). Plaintiff alleges that the 10b–5–1 plans were adopted or amended to allow Defendants to sell more shares of stock, but does not allege that the Defendants adopted or amended them while in possession of the alleged material inside information concerning the Sprint cancellation and loss of market share. 17 C.F.R. § 240.10b5–1(c)(1)(i)-(ii). Plaintiff also alleges that these sales took place when Novatel had been recently certified with Vodafone. Thus, Defendants unloading stock near in time to when the market

would inevitably learn of the alleged Sprint cancellation does support an inference that Defendants timed their sales to benefit from stock prices before the information leaked to the market. Although Defendants traded according to 10b5-1 plans, Plaintiff's allegations that the Defendants amended their 10b5-1 plans to allow more stock sales based on their inside information coupled with the unusual pattern of sales supports an inference of scienter.

■ Defendants also contend that because Plaintiff has not pled Weinert's trading history, his sales cannot be used to establish an inference of scienter. (Doc. No. 80 at 16.) "For individual defendants' stock sales to raise an inference of scienter, plaintiffs must provide a 'meaningful trading history' for purposes of comparison to the stock sales within the class period." *Zucco*, 552 F.3d at 1005 (*citing In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1095–96 (9th Cir.2002)). "Even if the defendant's trading history is simply not available, for reasons beyond a plaintiff's control, the plaintiff is not excused from pleading the relevant history." *Id.* The Complaint does plead Weinert's trading history by alleging, "the following chart show[s] defendants' insider sales in the five years prior to the class period." (*Id.* ¶ 119.) The chart in the complaint lists all the insider sales for the individual Defendants from 12/1/03–2/27/07. (*Id.* ¶ 119.) Defendant Weinert is not listed as having any insider sales during that time period. (*Id.* ¶ 119.) Based on Weinert's lack of trading history, the Court can make a meaningful comparison. Weinert had no sales in the five years prior to the class period, and then is alleged to have sold $3,305,560 worth of stock, 90.19% of his unrestricted stock holdings, in a span of a month and a half during the class period and just prior to the market learning of the alleged Sprint cancellation at near class period highs. (*Id.* ¶ 116.) Plaintiff alleges that Weinert also traded

pursuant to a 10b–5–1 plan that was adopted or amended in order to allow him to sell more shares of stock. (Compl. ¶ 117.) Although a 10b–5–1 plan can rebut an inference of scienter, under these facts, Plaintiff's allegations concerning Weinert's stock sales do support an inference of scienter.

■ Plaintiff also alleges that Defendants systematically reported revenue before it was earned in violation of GAAP. "Violations of GAAP standards can also provide evidence of scienter." *In re Daou Sys.*, 411 F.3d 1006, 1016 (9th Cir.2005). However, "the mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish scienter." *DSAM Global Value Fund v. Altris Software, Inc.*, 288 F.3d 385, 390 (9th Cir.2002) (internal quotations omitted). "Rather, scienter requires more than a misapplication of accounting principles." *Id.* Plaintiff's complaint alleges that Novatel prematurely shipped products into a channel that was over-saturated and recognized revenue early in violation of GAAP. (Compl. ¶¶ 28–37.) Novatel admitted on November 10, 2008, that the Company lacked adequate internal controls which led to early shipments and GAAP violations. (*Id.* ¶¶ 84, 104–110.) Novatel moved $3.4 million originally recognized in 1Q08 to 2Q08, 4% of its revenues, after conducting an enhanced review of accounting. (*Id.* ¶ 91.) A former employee stated that there was always a crunch time at the end of each quarter and that Novatel would frequently ship significant amounts of product up to four weeks early. (*Id.* ¶ 112.) Plaintiff alleges this supports the allegations that Defendants were knowingly violating GAAP in order to exceed or meet Wall Street expectations. (*Id.* ¶ 112.) Plaintiff alleges that Defendants' violations of GAAP were failures to comply with the most basic accounting rules governing rev-

enue recognition. (*Id.* ¶¶ 94–95, 98.) Given the complaint's allegations concerning early product shipment, over saturated channels, a restatement of financial results based on GAAP violations, Defendant Leparulo's statement that the "buck stops with him," Defendant Weinert's SOX certifications that he attested to the accuracy of the Company's financial results and internal controls, and the simplicity of the accounting principles violated, Defendants' GAAP violations just as likely support an inference that Defendants Weinert and Leparulo acted with scienter as an inference of innocent and unknowing behavior.

Defendants also argue that the accounting error was insignificant in its amount and Novatel never had to issue a restatement; however, the significance of the amount is more appropriately directed to the materiality element of the securities violation claim, which is typically a fact-intensive question. *Phan*, 500 F.3d at 908.

■ Plaintiff's complaint alleges that Weinert and Leparulo signed SOX certifications during the Class Period that they knew or had reason to know were false and misleading. " 'Sarbanes–Oxley certifications are not sufficient, without more, to raise a strong inference of scienter.' " *Zucco*, 552 F.3d at 1004 (*quoting Glazer Capital Mgmt., LP v. Magistri*, 549 F.3d 736, 747–48 (9th Cir.2008)). The Court concludes that Plaintiff fails to plead any SOX certifications signed by Leparulo and that Plaintiff does not allege with sufficient particularity that Weinert signed false SOX certifications for 2007 financial results. (Compl. ¶¶ 56, 61, 65, 72.) Therefore, allegations concerning Weinert's SOX certifications do not support a strong inference of scienter.

Although none of Plaintiff's allegations concerning scienter are enough on their own to support a strong inference of scienter, the Court must evaluate them holistically to determine whether Plain-tiff's complaint as a whole establishes a strong inference that Defendants acted with scienter when making the various alleged misrepresentations. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 127 S.Ct. 2499, 2511, 168 L.Ed.2d 179 (2007); *South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008).

### a. Product Demand and Market Share

Plaintiff sufficiently pleads facts giving rise to a strong inference that Weinert and Leparulo knowingly or with reckless disregard made false or misleading statements concerning a strong product demand and market share. Plaintiff alleges that Weinert and Leparulo acted with scienter when making such statements based upon their suspicious stock sales, position in the company, importance of Sprint to Novatel's business, GAAP violations, and false SOX certifications. The Court concludes that these allegations taken holistically do support a strong inference of scienter. Weinert's and Leparulo's stock sales appear suspicious and support an inference of scienter. These suspicious sales coupled with other allegations of the importance of Sprint to Novatel's business, that Weinert and Leparulo held positions in this small company where they were undoubtedly aware of the alleged loss of market share and decreased product demand, Leparulo's admission that he oversaw the day-to-day operations of the company, Weinert's representations as the primary person with knowledge about Novatel's business, outlook, financial reports, and business practices, that Novatel regularly shipped product prematurely in order to meet Wall Street expectations in violation of GAAP support a strong inference that Weinert and Leparulo acted with scienter when making statements in 2007 concerning product demand and market share.

### b. Financial Results

Plaintiff alleges the Weinert and Leparulo acted with scienter when stating false financial results for 1Q08 because of the size of the company and their positions within it, violations of GAAP in revenue recognition, a confidential witness attesting to the practice of shipping product early, and false SOX certifications. Defendants' positions within the company and the size of the company alone do not establish a strong inference that Weinert and Leparulo acted with scienter in stating false financial results. *See South Ferry*, 542 F.3d at 785–86. However, when coupled with the alleged GAAP violation that concerned an allegedly simple accounting principle, a confidential employee reporting a practice of shipping product up to 4 weeks early during a crunch time that corroborates the lack of internal controls disclosed in 2008, and Defendants' statements to investors and the SEC that they are ultimately responsible for financial results, Plaintiff sufficiently alleges that Weinert and Leparulo acted with scienter when stating false financial results.

### c. False SOX Certificates

The Court concludes that Plaintiff fails to plead how any of the alleged class period SOX certifications signed by Weinert were false or misleading. Accordingly, Plaintiff also fails to plead facts to support a strong inference of scienter with respect to the alleged false SOX certifications. *See Ronconi*, 253 F.3d at 429 (pleading requirements of PSLRA may be collapsed into single inquiry because analysis of both factors involves same facts). However, because Plaintiff sufficiently alleges that Defendants acted with scienter in making other false or misleading statements, Plaintiff sufficiently alleges a claim against Defendants under § 10(b).

### 5. Loss Causation

■ A § 10(b) claim requires a plaintiff to allege that the plaintiff purchased stock in reliance on the defendants' alleged misrepresentations and that the defendants' misrepresentation or other fraudulent conduct proximately caused the plaintiffs economic loss. *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 346, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005). As stated by the Supreme Court this requirement, which "should not prove burdensome for a plaintiff," may be satisfied by alleging (1) that the plaintiff paid an artificially inflated price for the company's stock and (2) that the stock price fell "after the truth became known" regarding the defendant's misrepresentations. *Id.* "So long as the complaint alleges facts that, if taken as true, plausibly establish loss causation, a Rule 12(b)(6) dismissal is inappropriate." *In re Gilead Sciences Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir.2008). "A limited temporal gap between the time a misrepresentation is publicly revealed and the subsequent decline in stock value does not render a plaintiff's theory of loss causation per se implausible." *Id.* at 1058.

■ Plaintiff has alleged that it paid an artificially inflated price for the Company's stock due to false and misleading statements concerning Novatel's relationship with Sprint, financial results, product demand, and internal controls. Plaintiff alleges that Novatel's stock price fell after each time the truth became known over the Class Period.

#### a. July 20, 2007

Plaintiff selectively alleges that the truth concerning Sprint's alleged cancellation of its use of Novatel's 720 USB modem became known on July 20, 2007, which undercut previous statements concerning product demand and market share, and that the stock price fell after this disclo-

sure. (Compl. ¶ 16.) The complaint quotes an analyst report from July 20, 2007, that confirms the market learned of Sprint's alleged cancellation and speculated that Novatel's stock price was sharply off due to the revelation.[3] (*Id.* ¶ 17.) The complaint also alleges that the stock price fell 31% as a result of this disclosure, from $29 per share in late July to almost $20 by the beginning of August. (*Id.* ¶ 17.) Historical stock prices show that on July 20, 2007, Novatel stock opened at $28.31, which was the high for the day, reached a low of $25.09, and closed at $27.05, on high volume of 3.9 million shares. (Doc. No. 84, Ex. 3 at 136.) Thus, Plaintiff has sufficiently alleged loss causation as to July 20, 2007. The Court at this time need not address whether Plaintiff can also recover losses suffered between July 21 and August 1, 2007, as that is a factual matter not appropriate for a motion to dismiss.

### b. February 20, 2008 and April 14, 2008

Plaintiff alleges that disclosures by Novatel on February 20 and April 14, 2008 caused stock prices to fall on the basis of those disclosures. (Compl. ¶¶ 7, 8.) On February 20, 2008, Novatel issued a press release forecasting $110 million in revenues for 1Q08, which was $10 million below analysts' estimates. (*Id.* ¶¶ 67–68.) On the same day, Novatel disclosed that carriers were emphasizing the consumer market where Novatel "historically had not

placed an emphasis," which undermined Novatel's statements concerning product demand and the superiority of its products. (*Id.* ¶ 7.) On February 20, 2008, Novatel's stock closed at $13.86 per share and after trading on February 21, 2008 had fallen to $10.69 per share, on trading volume of over 11 million shares. (Doc. No. 84, Ex. 3 at 128; Compl. ¶ 7.)

On April 14, 2008, Novatel announced that 1Q08 revenues were $19 million short of Novatel's estimates. (*Id.* ¶ 8.) Defendant Leparulo partially attributed this shortfall to the fact that Novatel was "between product launch cycles for our USB devices and demand in the current environment has shifted toward lower end products" and that, "in some cases, we did not have the right products for the right customers." (*Id.* ¶¶ 76, 77.) These disclosures undercut Defendants' previous statements concerning product demand and ability to compete. On April 14, 2008, Novatel's stock closed at $10.01 per share and after trading on April 15, 2008 had fallen to $7.76 per share, on trading volume of over 12 million shares. (Doc. No. 84, Ex. 3 at 127–28; Compl. ¶ 8.) Defendants argue that the missed financial expectations alone are an "obvious alternative explanation" for the stock price drops. (Doc. No. 80 at 28.) While this may be an alternative plausible explanation, Plaintiff has sufficiently alleged that disclosures relating to product demand and mix are a

---

**3.** The complaint quotes only part of the analyst report, stating, "NVTL shares were off sharply this morning, we believe in response to a rumor that NVTL may lose market share at Sprint, who was a 38% customer for NVTL in Q1. We agree with the notion making the rounds indicating that the popular EU 720 USB card from NVTL will in fact be end-of-lifed at Sprint as early as next week." (Compl. ¶ 17.) The analyst report goes on to state, ", however our sources have indicated that Sprint has ample inventory and that the cards will continue to be sold at Sprint stores

likely through the end of August. We further believe that NVTL will begin shipping the new smaller form factor USB product in August (earlier than expected) and that the cards will likely begin showing up on Sprint shelves in early September, immediately after the EU720 inventory sells out. We understand this transition has been jointly planned for some time by NVTL and Sprint. As a result, we think there will be little or no gap in the sales of the two cards and as a result, no loss of market share." (Doc. No. 79, Ex. A.)

plausible reason for the market's reaction. Thus, Plaintiff has adequately alleged loss causation with respect to Defendant Weinert's and Leparulo's statements concerning product demand, as disclosures in 2008 caused stock prices to fall significantly.

### c. August 19, 2008

Plaintiff's complaint alleges that Novatel's disclosure on August 19, 2008, that Novatel broadened its accounting review and determined to move at least $3.4 million in revenue out of 1Q08 revealed the truth concerning a prior misstatement and caused a resulting stock price drop. (Compl. ¶ 81.) This disclosure contradicted the previous statement of the Company on May 13, 2008 that the review was substantially completed and that no change was expected to any previously reported financial statements. (*Id.* ¶ 79.) This disclosure also undercut Defendants' representations that the Company had sufficient internal controls in place and was acting in accordance with GAAP. Novatel's stock closed on August 19, 2008 at $8.40 per share and dropped the next day to close at $6.29 per share on trading volume of over 7 million shares. (Doc. No. 34, Ex. 3 at 123.) Plaintiff has sufficiently alleged loss causation regarding Defendants' prior statements concerning 1Q08 revenue based on this disclosure and resultant drop in stock price.

### d. November 10, 2008

Plaintiff's complaint alleges that Novatel's disclosure on November 10, 2008 of its accounting review results disclosed the truth concerning Novatel's financial results for 1Q08, disclosed Novatel's GAAP violations and internal control deficiencies,

and caused a resulting loss. The November 10, 2008 disclosure revealed that there were several control deficiencies in the Company's internal control over financial reporting that in the aggregate constitutes a material weakness. (Compl. ¶ 129.) This disclosure undercuts Defendants' previous statements concerning financial results and product demand. Plaintiff alleges that as a result of this disclosure Novatel's stock price fell from an opening of $5.33 per share on November 10 to a trading as low as $3.90 on November 17, 2008.[4] (*Id.;* Doc. No. 34, Ex. 3 at 121.) This is sufficient to meet the pleading requirements for loss causation.

Accordingly, the Court denies Defendants' motion to dismiss Plaintiff's first cause of action against Defendants Weinert and Leparulo as Plaintiff has sufficiently alleged a violation of § 10(b) and Rule 10b–5 at this stage based on the entirety of the complaint.

### B. Violation of § 10(b) of the 1934 Act and Rule 10b–5 Against All Defendants

Plaintiff's second cause of action is against all Defendants for insider trading in violation of § 10(b) and Rule 10b–5 on the basis of Defendants' knowledge about Sprint's cancellation of its orders for Novatel's 720 USB modem. (Compl. ¶¶ 146–53.) Plaintiff alleges that during the class period, "defendants occupied positions with Novatel that allowed access to confidential information concerning the Company, its operations, finances, financial condition and future business prospects" and that "Defendants' public representations on these subjects were materially false or

---

4. Plaintiff's complaint cites the date of November 10, 2007 and an opening price of $15.33. (Compl. ¶ 129.) From a review of the complaint and historical stock prices, this appears to be a typographical error, as the

disclosure occurred on November 10, 2008, which had an opening share price of $5.33. (Doc. No. 84, Ex. 3 at 123.) Furthermore, November 10, 2007 was a Saturday.

misleading." (*Id.* ¶ 147.) Plaintiff alleges that "[n]otwithstanding their duty to refrain from trading in Novatel common stock unless they disclosed the materially adverse facts alleged herein, and in violation of their fiduciary duties to plaintiff and other members of the Class, defendants each sold millions of dollars worth of Novatel common stock during the Class Period." (*Id.* ¶ 148.) According to Plaintiff, Defendants sold their shares of Novatel common stock "at market prices artificially inflated by the nondisclosure and misrepresentations of material adverse facts in the public statements released during the Class Period." (*Id.* ¶ 149.)

"Under the 'traditional' or 'classical theory' of insider trading liability, § 10(b) and Rule 10b–5 are violated when a corporate insider trades in the securities of his corporation on the basis of material, nonpublic information." *U.S. v. O'Hagan*, 521 U.S. 642, 651–52, 117 S.Ct. 2199, 138 L.Ed.2d 724 (1997). "A purchase or sale of a security of an issuer is 'on the basis of' material nonpublic information about that security or issuer if the person making the purchase or sale was aware of the material nonpublic information when the person made the purchase or sale." 17 C.F.R. § 240.10b5–1(b). "To establish liability under 10(b) and Rule 10b–5, a private plaintiff must prove that the defendant acted with scienter, 'a mental state embracing intent to deceive, manipulate, or defraud.'" *Tellabs*, 127 S.Ct. at 2507 (citation omitted).

### 1. Materiality

Plaintiff sufficiently alleges that the alleged Sprint cancellation of its orders of the 720 USB modem was material. Plaintiff alleges that Sprint was Novatel's largest customer during the class period and that the market reacted on the day of the disclosure of this alleged cancellation. Therefore, Plaintiff sufficiently alleges that Sprint's alleged cancellation of all future orders for a product would likely be viewed by the reasonable investor to alter the total mix of information.

### 2. Scienter

Plaintiff sufficiently alleges that Defendants Weinert and Leparulo acted with scienter when making insider sales with respect to their knowledge about the alleged Sprint cancellation. Plaintiff's allegations of Weinert's and Leparulo's suspicious stock sales coupled with their positions in corporate management, the importance of Sprint to Novatel's business, and the allegation that Novatel "knew for some time" of the alleged cancellation supports a strong inference of scienter.

 Plaintiff's complaint alleges Defendants Hadley, Ratcliffe, and Souissi also acted with scienter when selling stock before the July 20, 2007 disclosure of the alleged Sprint cancellation based upon the size of the company and suspicious stock sales. Plaintiff alleges that Defendants were undoubtedly aware of Sprint's cancellation of orders for the 720 USB modem due to the size and importance of Sprint's business, as Sprint accounted for 38% of Novatel's revenue in 2006. (Compl. ¶ 121.) "As a general matter, 'corporate management's general awareness of the day-to-day workings of the company's business does not establish scienter-at least absent some additional allegation of specific information conveyed to management and related to the fraud' or other allegations supporting scienter." *South Ferry*, 542 F.3d at 785–86 (citation omitted). Thus, Plaintiff's allegation that Defendants Hadley, Ratcliffe, and Souissi must have known due to their positions and size of the company is not enough to establish scienter absent some other allegations to support such an inference.

Plaintiff alleges that Hadley's, Ratcliffe's, and Souissi's stock sales were sus-

picious leading up to the July 20, 2007 disclosure and support an inference of scienter. "[I]nsider trading is suspicious only when it is dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." *Ronconi*, 253 F.3d at 435 (internal quotations omitted). The three relevant factors are: "(1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history." *Id.* Hadley sold 220,365 shares in the months leading up to the disclosure of the alleged Sprint cancellation for proceeds of $4,396,746. (Compl. ¶ 116.) Hadley in the three years prior to the class period had sold 214,786 shares for proceeds of $3,579,491. (*Id.* ¶ 119.) Ratcliffe sold 115,366 shares in the two months before the disclosure for proceeds of $2,998,178, and did not sell any shares in the five years prior to the class period. (*Id.* ¶¶ 116, 119.) Souissi sold 209,938 shares for proceeds of $4,344,488 during the class period leading up to the July disclosure. (*Id.* ¶ 116.) In the three years prior to the class period Souissi sold a total of 156,716 shares for proceeds of $2,849,050 and had not made a trade since July 2005. (*Id.* ¶ 119.) Plaintiff additionally alleges that Defendants Hadley, Ratcliffe, and Souissi all adopted or amended their 10b5–1 trading plans to allow them to sell more shares of stock months before the market learned of Sprint's decision to cancel orders of the 720 USB modem. (*Id.* ¶ 117.) Plaintiff's allegations concerning Defendants' suspicious stock sales support an inference of scienter, as their sales are out of proportion with prior trading practices and suspiciously timed.

The Court concludes that when the complaint is evaluated holistically, Plaintiff sufficiently alleges that Defendants Hadley, Ratcliffe, and Souissi acted with scienter of the material nonpublic information concerning the Sprint cancellation when making insider sales. Plaintiff's allegations that Defendants acted with scienter because they held upper management positions and Novatel knew of the Sprint cancellation for some time coupled with the suspicious sales supports a strong inference of scienter.

### 3. Loss Causation

The failure of the Defendants to disclose the material information concerning the Sprint cancellation resulted in a loss to shareholders, as Plaintiff sufficiently alleges that it purchased stock at inflated prices due to the non-disclosure and the stock price fell sharply on July 20, 2007 when the information leaked to the market. (Compl. ¶¶ 16, 17.)

Accordingly, the Court concludes Plaintiff has sufficiently alleged a cause of action against all Defendants for insider trading on the basis of the alleged Sprint cancellation to meet the PSLRA standards and therefore denies Defendants' motion to dismiss Plaintiff's second cause of action. Disputes between the parties concerning these insider sales are more appropriate for summary judgment.

### C. Violation of § 20(a) of the 1934 Act Against All Defendants

Plaintiff's third and final cause of action is against all Defendants for a violation of § 20(a) of the 1934 Act. (Compl. ¶¶ 154–55.) Plaintiff alleges "defendants acted as controlling persons of Novatel within the meaning of § 20 of the 1934 Act. By virtue of their positions and their power to control public statements about Novatel, the defendants had the power and ability to control the actions of Novatel and its employees. Novatel controlled the defendants and its other officers and employees. By reason of such conduct, defendants are liable pursuant to § 20(a) of the 1934 Act." (*Id.* ¶ 15.)

**1192**

"Section 20(a) [of the Exchange Act] provides joint and several liability for controlling persons who aid and abet violations of the 1934 Act absent a finding of good faith and lack of inducement." *America West*, 320 F.3d at 945; 15 U.S.C. § 78t(a). In order to plead control person liability, a plaintiff must allege (1) a primary violation of the securities laws and (2) "that the defendant exercised actual power or control over the primary violator." *America West*, 320 F.3d at 945 (internal quotations omitted). Scienter is not an element of control person liability; instead, a defendant may assert the affirmative defense of good faith by establishing the absence of scienter. *Howard v. Everex Systems, Inc.*, 228 F.3d 1057, 1065 (9th Cir.2000). Here the first element is satisfied because, as discussed above, Plaintiff's complaint has adequately alleged a primary violation by Defendants under § 10(b) and Rule 10b–5.

The Court concludes that Plaintiff's complaint alleges that Defendants Weinert, Leparulo, Hadley, Ratcliffe, and Souissi exercised sufficient control over Novatel to state a claim against those individuals for secondary liability for the alleged primary violations by Novatel. The complaint asserts that these individual Defendants, all of whom were executives of Novatel, "[b]y virtue of their positions and their power to control public statements about Novatel, the defendants had the power and ability to control the actions of Novatel and its employees." (Compl. ¶¶ 44–48, 155.) The complaint alleges that "defendants occupied positions with Novatel that allowed access to confidential information concerning the Company, its operations, finances, financial condition and future business prospects." (*Id.* ¶ 147.) Plaintiff also alleges that, "Novatel controlled the defendants and its other officers and employees." (*Id.* ¶ 155.) Thus, the Plaintiff has alleged Defendant Novatel controlled the individual Defendants to state a claim against Novatel for secondary liability for the alleged primary violations by the individual Defendants.

### Conclusion

For the reasons set forth above, the Court DENIES Defendants' motion to dismiss as Plaintiff has met the pleading standards of the PSLRA. The Court orders the Defendants to file an answer within 30 days of the date of this order.

**IT IS SO ORDERED.**